Filed 5/1/25  P. v. Santiago CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B335345 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA104289) |
| v. | |
| JOSE ANTONIO SANTIAGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dorothy L. Shubin, Judge. Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose Antonio Santiago appeals from his conviction for the murder of Jerry Chan. He challenges the language of a jury instruction and the trial court's sustaining two objections by the prosecution; he also argues his trial counsel rendered him constitutionally ineffective assistance. We reject his challenges and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

This criminal case arose from a fatal stabbing outside the Colorado Bar in Pasadena, California, early on the morning of September 12, 2018. Jose Santiago drank five drinks at the bar over several hours on the evening of September 11, 2018. According to the bartender, Santiago acted normally while he was there. Jerry Chan and Daniel Trevino were also at the bar that night; they were friends and regular patrons. Trevino arrived around 8:30 p.m. or 9:00 p.m. He did not know Santiago, and he declined Santiago's invitation to play pool. Later in the evening around 11:00 p.m. or midnight, Trevino asked Santiago to play pool, but Santiago declined because he was about to leave.

Chan arrived at the Colorado Bar close to midnight. While Chan spoke to the bartender, Santiago approached him and said they had previously met. Chan apologized and said he did not remember Santiago. After a few minutes of further conversation about whether they were acquainted, Chan and Santiago shook hands, and Chan said, " 'Okay. I'll remember you now.' " Santiago walked away, paid his bar tab at 11:53 p.m., and left the bar after smiling, waving goodbye, and shaking the hands of some other patrons.

After Santiago left the Colorado Bar, he went to a Denny's restaurant across the street. He had forgotten to pay the last time he had been there, so the restaurant manager reminded him

2

to do so. He calmly ate his food, and he had a friendly conversation with the manager and a server. He told them he was a veteran and that he sometimes felt stressed.

Santiago left Denny's around 12:36 a.m. and walked a half mile to a Vons grocery store. He tried to purchase a kitchen knife with a blade about eight inches long, but was unable to do so because the registers were not working. Santiago waited for the registers to reopen, falling asleep at one point but also pacing and sometimes appearing anxious. When the registers reopened at 1:15 a.m., Santiago bought the knife. He told the cashier to hurry because he had a woman waiting for him to cook using the knife; he also made a crude comment about having sex with that woman later. Santiago started to remove the knife from its packaging, but the store manager put it back inside the packaging.

Meanwhile, at the Colorado Bar, the bartender announced the last call for drinks around 1:30 a.m. Trevino and Chan went outside to smoke; Trevino said they were both in a good mood. While they were talking on the sidewalk, Santiago approached them. Santiago started speaking to Chan, and according to Trevino, both seemed to be apologizing to each other for an earlier encounter inside the bar. Both men seemed cheerful or in good moods, and Trevino said Santiago seemed to be accepting Chan's apology. Santiago hugged Chan.

While Santiago was hugging Chan, he suddenly made a stabbing motion to Chan's torso. When Santiago pulled his hand back, Trevino saw he had a knife. Trevino grabbed Santiago's wrist and told Chan to grab the knife. A struggle for the knife ensued, and all three men fell to the ground. Santiago said something to Chan like, " 'That's what you get for talking to me

like that.' " During the struggle, the knife lodged in Trevino's thigh. A passerby intervened to assist Trevino in maintaining control of Santiago. Santiago yelled he was a veteran with posttraumatic stress disorder (PTSD), Trevino and Chan were drug dealers, Chan had tried to stab him, and he would kill the passerby next.

The police then arrived on the scene. When an officer asked what had happened, Santiago repeated his accusation that Chan was a drug dealer who had disrespected him, so he got even. Santiago further explained that Chan had threatened to hurt him, so he went to Vons, bought a knife, and confronted Chan.[1] Santiago also told the officer that he was a disabled veteran who had served in the United States Army during the Vietnam War.

Chan died from the stab wound Santiago had inflicted. Trevino recovered, but he had surgery, was in the hospital for about a week, and had to use a walker for about a month. The police did not uncover any evidence that either Trevino or Chan dealt drugs.

Santiago was charged in a second amended information with: count 1, the murder of Jerry Chan (Pen. Code, § 187, subd. (a))[2]; count 2, the attempted murder of Trevino (§§ 187, subd. (a), 664); and count 3, assault with a deadly weapon on Trevino (§ 245, subd. (a)(1)). The information alleged Santiago personally used a deadly and dangerous weapon (a knife) as to counts 1 and 2 (§ 12022, subd. (b)(1)), and that he personally

---

[1] Santiago later told his wife the same thing in a recorded telephone call from jail on September 12, 2018.

[2] All further undesignated statutory references are to the Penal Code.

4

inflicted great bodily injury as to counts 2 and 3 (§ 12022.7, subd. (a)). It also alleged aggravating factors pursuant to California Rules of Court, rule 4.421.

Santiago pled not guilty and proceeded to trial.[3] He relied on an imperfect self-defense theory: he sought to show he suffered from PTSD after his military service; his PTSD had caused him to irrationally believe he needed to defend himself from Chan; and Trevino had been unintentionally stabbed during the struggle.

In support of that theory, Santiago presented expert opinion testimony from forensic psychologist Nicole Vienna. Dr. Vienna met with Santiago twice and reviewed his voluminous records from the United States Department of Veterans Affairs (VA). The VA records showed Santiago had been diagnosed with PTSD in 2011. Dr. Vienna agreed with that diagnosis, which she believed arose mainly from his miliary service in Vietnam, as well as from when he was sexually assaulted as a child and stabbed in a bar around 1974. Dr. Vienna testified Santiago's PTSD caused a number of symptoms, including: re-experience of the traumatic event (e.g., Santiago habitually watched movies about the Vietnam War); persistent avoidance of stimuli associated with the event (e.g., Santiago avoided talking about his traumatic experiences and inconsistently participated in treatment for his PTSD); negative alterations in mood and cognition (e.g., Santiago's chronic irritability and negative thoughts about himself); negative alterations in arousal or

---

[3]     In the interim, criminal proceedings were suspended for about 14 months to determine issues related to Santiago's mental competency. (See § 1368.)

5

reactivity (e.g., Santiago consistently felt "on edge" and habitually scanned for potential danger); and an exaggerated startle response (e.g., Santiago perceived threats that were not present). Dr. Vienna also opined that paranoia was a factor in Santiago's mental condition, in that he was "constantly . . . on edge, anticipating perceived or potential danger where there might not be any present."

Santiago's wife, Isidora Rivera, testified at trial. Rivera testified that after his military service, Santiago was quiet, antisocial, depressed, paranoid, sometimes disoriented or detached from reality, and that he had nightmares which occasionally caused him to scream. His behavior deteriorated as he got older. In particular, she recounted one incident in which Santiago became fearful while they traveled by airplane to Hawaii, and he locked himself in the hotel room for a week.

The jury found Santiago guilty of first degree murder in the killing of Chan and found the weapon use allegation to be true. They also convicted him of assault with a deadly weapon on Trevino and found the great bodily injury allegation to be true. The jury acquitted Santiago of attempted murder of Trevino. Santiago was sentenced to seven years plus 25 years to life in state prison. Judgment was rendered on February 14, 2024. Santiago timely appealed. (See § 1237, subd. (a); Cal. Rules of Court, rules 8.304(a)(1), 8.308(a).)

## DISCUSSION

Santiago argues the trial court abused its discretion in sustaining prosecution objections to two questions during his direct examination of Dr. Vienna. He also argues the language of one jury instruction was incorrect and his counsel rendered him constitutionally ineffective assistance by failing to propose an

6

instruction regarding hallucinations or delusions. We reject his arguments and affirm the judgment.

## I.  Any Errors in Sustaining Two Prosecution Objections Were Harmless

### A.  Standard of Review

"A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion." (*People v. Pearson* (2013) 56 Cal.4th 393, 443 (*Pearson*).) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

A trial court's erroneous exclusion of evidence does not warrant reversal unless "it is . . . reasonably probable defendant would have achieved a more favorable result absent the exclusion of [the] evidence." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203; see also *People v. Watson* (1956) 46 Cal.2d 818, 836 [enunciating that standard].) It is the defendant's burden to demonstrate prejudice. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195.)

### B.  Even if a Question Posed to Dr. Vienna Did Not Call for Improper Expert Opinion, Sustaining the Objection Was Harmless

During direct examination of Dr. Vienna, defense counsel asked her if Santiago's paranoia "impact[ed] how he perceived facts, at least, versus what, maybe, a different person might— how a different person might interpret certain facts?" The court sustained the prosecution's objection that the question solicited an "[i]mproper opinion." Santiago argues that was an abuse of discretion because the question sought to elicit evidence of his mental functioning to help the jury decide whether he had formed

the mental states required for the charged crimes at the time of the stabbing.

### 1. General Parameters of Expert Opinion Testimony

A witness qualified as an expert may testify to her opinions " 'only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' (*People v. Vang* (2011) 52 Cal.4th 1038, 1044; see also Evid. Code, §§ 720, subd. (a), 801, subd. (a).) An expert may provide evidence of a defendant's "mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense." (*People v. Coddington* (2000) 23 Cal.4th 529, 582, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see Pen. Code, § 28, subd. (a).) However, the expert may not "offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*Coddington*, at p. 582; see Pen. Code, §§ 28, subd. (a), 29.)

### 2. Any Error in Sustaining the Objection Was Harmless

Santiago argues Dr. Vienna's testimony was generally relevant to undermine the prosecution's assertion he had acted with the mental states required for murder (malice) and first degree murder (premeditation and deliberation). (§§ 187, subd. (a), 189, subd. (a).) Santiago is not specific about how Dr. Vienna's answer to the particular challenged question would have borne upon the jury's decision about his mental state at the time of the crime.

However, the crux of this case was Santiago's claim of imperfect self-defense–that his PTSD caused him to unreasonably believe he needed to defend himself against Chan, so he did not act with malice. (See *People v. Schuller* (2023) 15 Cal.5th 237, 243 (*Schuller*) [imperfect self-defense " 'negates what would otherwise be malice' "].) We recognize that if Dr. Vienna testified Santiago perceived facts differently than a person without his mental condition, it would have been some evidence supporting an inference that Santiago " 'actually did not harbor malice, premeditate, or deliberate' "–e.g., that he lacked the required intent for the charged crimes. (*People v. Herrera* (2016) 247 Cal.App.4th 467, 477; see also Evid. Code, § 210.) But nothing in the question invited Dr. Vienna to "cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged.' " (*Herrera*, at p. 476.) Nor did the question ask Dr. Vienna whether Santiago actually misperceived facts at the time of the stabbing. (Cf. *Pearson*, *supra*, 56 Cal.4th at pp. 442–444 [asking an expert if the defendant thought about homicide before the murder improperly solicited an opinion on premeditation and deliberation]; *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 [expert cannot "offer[] an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted"].) Thus, it may have been an abuse of discretion to sustain the objection. Nevertheless, reversal is not warranted because any error was plainly harmless.

Santiago argues he can demonstrate prejudice because the "jury was not easily convinced of his guilt," and the answer to the

9

question "would necessarily have served to inform the jury on the question of whether he mentally [*sic*] impaired and suffered from PTSD on *the date of the homicide*." We disagree. The jury heard plenty of evidence that Santiago suffered from PTSD. Moreover, Dr. Vienna directly testified individuals with PTSD "could perceive things differently," including seeing threats that "may not be there." She specifically stated that "someone like Mr. Santiago" interprets the environment "constantly as there's a potential threat," even "when one may not actually exist," and he "respond[s] as if there's actual danger when there might not be." Santiago thus cannot demonstrate prejudice from the exclusion of the evidence because defense counsel was able to elicit testimony from Dr. Vienna that Santiago perceived facts differently from other people. (See *People v. Nieves* (2021) 11 Cal.5th 404, 441 [no prejudice where "defense experts were otherwise able to testify concerning the substance of what defendant sought to present"]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 663 [no prejudice where "the substance of" the expert's "testimony was presented to the jury"].)

Even assuming the objection should not have been sustained, any error was harmless.

### C.      The Trial Court Did Not Abuse Its Discretion in Sustaining an Objection to a Question Calling for Speculation

Santiago next argues the trial court erred in sustaining another prosecution objection during his direct examination of Dr. Vienna. Defense counsel first asked Dr. Vienna if she had "testified that [Santiago's] recurring thoughts and stressors were persistent, at least in your review of the VA file?" Dr. Vienna agreed. Defense counsel then posed the question that prompted

10

the prosecutor's objection: "The stressors, the feelings of anxiety, are those present in Mr. Santiago even when he's not exposed to a trigger?" The court sustained the prosecution's objection that the question "call[ed] for speculation." Defense counsel essentially rephrased the question and asked Dr. Vienna: "Did you see evidence in Santiago's VA file that Mr. Santiago consistently experienced stresses from the traumas that you described?" No objection was made, and Dr. Vienna answered affirmatively.

Santiago argues the trial court abused its discretion in determining the second question sought a speculative response.

### 1. The Question Did Not Specify the Evidence Upon Which Dr. Vienna's Opinion Would Rely

" '[A]n expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; see also Evid. Code, § 801, subd. (b).) An expert opinion " 'may not be based on "assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors." ' " (*People v. Flores* (2020) 9 Cal.5th 371, 398 (*Flores*).) Rather, an expert should rely upon " 'the type of matter that an expert reasonably can rely on in forming an opinion.' " (*Sargon Enterprises, Inc.*, at p. 770.) "[T]he trial court acts as a gatekeeper to exclude speculative . . . expert opinion." (*Ibid.*)

Santiago's reply brief argues Dr. Vienna's response would not have been speculative because "Dr. Vienna [examined] more than 1,000 pages of documents related to Santiago's mental condition in combination with several face-to-face interviews."

11

We conclude the trial court reasonably sustained the objection because the question did not specify the evidence upon which Dr. Vienna would base her opinion. No objection was made to the question immediately following, in which defense counsel explicitly asked Dr. Vienna to base her answer on her review of Santiago's VA records. Thus, the exclusion appears to have been based on counsel's failure to specify the evidence upon which Dr. Vienna was to rely. (See *Flores*, *supra*, 9 Cal.5th at p. 402 [trial court "exercise[d] its discretion to exclude questions lacking evidentiary support" and "repeatedly struck [expert's] testimony when it was not grounded in facts in evidence"].) On this record, that ruling was not irrational or arbitrary.

### 2.    Any Error Was Harmless

Even if there were some error in sustaining the objection, it was harmless. As explained above, defense counsel readily rephrased her question to ask Dr. Vienna to base her answer on evidence from Santiago's VA file. That is among the evidence Santiago points to in his reply brief as properly supporting Dr. Vienna's opinion. Moreover, the defense ultimately introduced plenty of evidence that Santiago experienced PTSD symptoms when he was not exposed to triggers: Dr. Vienna agreed Santiago's "recurring thoughts and stressors were persistent," and he "consistently experienced stresses from the traumas that [Dr. Vienna] described."

Thus, any error in sustaining the objection was harmless.

## II.    The Jury Instruction Premised Upon CALCRIM No. 3428 Was Not Misleading

The judge instructed the jury: "You have heard evidence that the defendant may have suffered from a mental disease, defect or disorder. You may consider this evidence only for the

limited purpose of deciding whether at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." The instruction further explained that in count 1 (murder), the mental state the People had to prove was "malice aforethought," while in count 2 (attempted murder and the lesser crime of attempted voluntary manslaughter), the mental state the People had to prove was "express malice." The instruction did not specify the mental states for any other crimes.

Santiago argues the instruction "misstated the law by telling the jury that as to count 1, murder, evidence of mental disease and defect would *only be considered* in negating the elements of malice aforethought . . . ; not premeditation and deliberation." The People argue Santiago has forfeited review of the instruction because he failed to object at trial. We exercise our discretion to consider the issue on its merits,[4] and we perceive no error.

### A. Standard of Review

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).)

### B. The Instruction Was Not Incorrect or Misleading

The instruction accurately stated the law because it told the jury it could consider evidence of Santiago's mental disease to determine whether he "acted with the intent or mental state

---

[4]    See *People v. Williams* (1998) 17 Cal.4th 148, 161, footnote 6 (Court of Appeal has discretion to "reach[] a question that has not been preserved for review").

13

required for that crime." The focus of Santiago's argument is that the instruction was nevertheless misleading because it specified the mental state the People had to prove for murder (malice), but failed to specify the additional mental states required for first degree murder (premeditation and deliberation). Thus, he argues the jury could have thought it could not consider evidence of his PTSD in determining whether he acted with premeditation and deliberation. We are not persuaded.

"[I]n reviewing an ambiguous instruction . . . , we inquire 'whether there is a reasonable likelihood that the jury has applied the instruction in a way' that violates" the law. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Clair* (1992) 2 Cal.4th 629, 663 [adopting that standard in California law].) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record . . . .' " (*Mitchell, supra,* 7 Cal.5th at p. 579; see also *Middleton v. McNeil* (2004) 541 U.S. 433, 437 (per curiam) [review is of "the charge as a whole"].)

When viewed in the broader context of the other instructions and the trial record, there is no reasonable likelihood the jury applied the instruction in the manner Santiago suggests. First, the other instructions told the jury that in order to find Santiago guilty of murder, the People had to prove that he acted "with a specific intent or mental state" that was "explained in the instruction for that crime." The instruction for first degree murder stated the People had to prove Santiago "acted willfully, deliberately, and with premeditation" in order to find him guilty of first degree murder. It further explained that a "defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." And, "[t]he defendant acted with premeditation if he decided

14

to kill before completing the act that caused death." The jury was also told that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Our Supreme Court has already "rejected claims that a trial court erroneously failed to identify premeditation and deliberation as a mental state to which evidence of mental disease or defect was relevant" when "the trial court . . . explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder." (*People v. Rogers* (2006) 39 Cal.4th 826, 881 (*Rogers*).) The concepts of premeditation and deliberation were fully explained to this jury, and "[t]he jury would have understood that they are mental states." (See *id.* at pp. 881–882.)

Moreover, the challenged instruction plainly " 'relat[ed] [mental disease or defect] to mental state,' " and thus " 'necessarily directed the jury's attention to evidence of [mental disease or defect] as it related to premeditation and deliberation.' " (*Rogers*, *supra*, 39 Cal.4th at p. 882.) We recognize in this case, unlike in *Rogers*, the instruction at issue specifically referred to the mental states required for some charged crimes (murder in count 1, and attempted murder and attempted voluntary manslaughter in count 2). (Cf. *id.* at pp. 880–881 [instruction failed "to identify the specific mental state . . . to which defendant's mental health evidence was relevant"].) But, particularly in light of the other instructions describing the mental states required for first degree murder, we see no reasonable likelihood that the jury interpreted this instruction as prohibiting them from using Santiago's mental state evidence to evaluate his culpability for first degree murder. (See *People v.*

15

*Sanchez* (2001) 26 Cal.4th 834, 852 [presuming jurors follow their instructions].)

Our conclusion is reinforced by the parties' closing arguments.[5] (See *Rogers*, *supra*, 39 Cal.4th at p. 882 ["defense counsel's argument reinforced the notion inherent in the instructions that premeditation and deliberation are mental states"].) The prosecution explained that Santiago's behavior from the time he left the bar to his return, when he lured Chan into a hug in order to stab him with the concealed knife he had just bought, showed Santiago had "a willful, deliberate, premeditated intent to kill." And the prosecutor emphasized that "PTSD had nothing to do with the choices the defendant made that night," including his behavior after leaving the bar and the stabbing itself. Defense counsel drew the jury's attention to "the severity of his diagnosis," told them Santiago "was in the worst place that night," and explained how that informed all of Santiago's actions that night, particularly during the period after he left the bar and before the stabbing.

We therefore "find no basis to conclude the jury misinterpreted the . . . instruction[] or was confused in any manner" as to whether the mental disease evidence applied to the first degree murder charge. (*Young*, *supra*, 34 Cal.4th at p. 1203.)

---

[5] We acknowledge counsel's arguments are no substitute for correct instructions, but here they "support our conclusion that the jury was not misled." (*Rogers*, *supra*, 39 Cal.4th at pp. 869–870; see also *People v. Young* (2005) 34 Cal.4th 1149, 1202 (*Young*) ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."].)

## C.   Any Error Was Harmless

Even if there were an error in the instruction, reversal would not be warranted because it was surely harmless.

We reject Santiago's argument that any error in the instruction must be harmless beyond a reasonable doubt. (See *People v. Mil* (2012) 53 Cal.4th 400, 417 [standard applies when an instruction omits an element]; see also *People v. Hendrix* (2022) 13 Cal.5th 933, 942 [standard applies to " 'violations of the federal Constitution' "].) The instruction here did not omit an element of a charged offense. (Cf. *Mil*, at p. 417 [two omitted elements].) Thus, we apply "[t]he 'generally applicable California test for harmless error,' " pursuant to which "we deem an error harmless unless it is 'reasonably probable' the outcome would have been different in the absence of the error." (*Hendrix*, at p. 942; *ibid.* [standard "applies to ' " 'incorrect, ambiguous, conflicting, or wrongly omitted instructions' " ' "].)

Santiago's opening brief contains no more than a conclusory assertion that there was a reasonable probability the outcome of the trial would have been different had the instruction been modified. In light of the evidence and the parties' theories of the case, we see no reasonable probability the outcome would have been different. The defense's theory was that Santiago was categorically not guilty of murder in any degree because he did not "harbor[] in his broken mind the necessary intent to have committed murder in either the first or second degree." By contrast, the prosecution argued "that PTSD had nothing to do with the choices the defendant made that night." Nothing in this trial record suggests any evidence or theory by which the jury could reject Santiago's imperfect self-defense argument (and thus find that he acted with malice), but simultaneously determine he

17

did not act with deliberation and premeditation. On the contrary, the defense argued Santiago's PTSD critically influenced virtually all of his conduct on the night of the stabbing. The jury necessarily rejected that theory when it determined that Santiago was guilty of murder. (See *Schuller*, *supra*, 15 Cal.5th at p. 243 [a defendant who kills in an unreasonable but good faith belief in the need for self-defense is guilty of voluntary manslaughter, not murder].)

Thus, even if an error occurred, it was harmless.[6]

## III. Trial Counsel's Failure to Request an Instruction Premised Upon CALCRIM No. 627 Did Not Amount to Constitutionally Ineffective Assistance

Santiago argues his counsel rendered him constitutionally ineffective assistance by failing to request the court give a jury instruction premised on CALCRIM No. 627. That instruction would have informed the jury: "A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening. [¶] You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first

---

[6] Because this claimed error fails on its merits, Santiago's "related claim[] of ineffective assistance of counsel [necessarily] fail[s] and do[es] not require further discussion." (*People v. Ledesma* (2006) 39 Cal.4th 641, 748 (*Ledesma*).)

18

degree murder." (CALCRIM No. 627.) Santiago asserts the instruction could have been modified if the record contained evidence of delusions instead of hallucinations.

We disagree counsel's assistance was ineffective.

## A. General Parameters of Ineffective Assistance of Counsel Claims

A defendant has a right to effective assistance of counsel under both the United States and California Constitutions. (*Strickland v. Washington* (1984) 466 U.S. 668, 684, 686; *People v. Ochoa* (1998) 19 Cal.4th 353, 414.) "In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness . . . under prevailing professional norms.' " (*Ledesma*, *supra*, 39 Cal.4th at pp. 745–746.) "Unless a defendant establishes the contrary, we . . . presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*Id.* at p. 746.) "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected '. . . unless there simply could be no satisfactory explanation.' " (*Ibid.*) Once the defendant meets that burden, "he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Ibid.*)

## B. Santiago Failed to Show His Trial Counsel's Performance Was Deficient

Santiago failed to demonstrate his counsel's performance was deficient in failing to request the instruction. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "[W]e will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) Moreover, we must be cautious " 'to eliminate the distorting effects of hindsight' " when evaluating counsel's performance. (*People v. Earp* (1999) 20 Cal.4th 826, 896.)

Santiago asserts that "it is inexplicable why counsel failed to request" CALCRIM No. 627, but we do not find it difficult to understand.

First, defense counsel could have reasonably determined the instruction was unwarranted by the evidence in the record. (See *People v. Price* (1991) 1 Cal.4th 324, 386–387 [counsel not ineffective for failing to make futile motion or objection]; *People v. Marshall* (1997) 15 Cal.4th 1, 39 ["A trial court must give a requested instruction only if it is supported by substantial evidence . . . ."].) Santiago has not pointed to substantial evidence of hallucinations or delusions here. Those words do not appear in the reporter's transcripts of the proceedings. Santiago argues he had "paranoid perceptions not based on objective reality," and that has some support in the evidence. Dr. Vienna testified Santiago exhibited paranoia in "watching his surroundings" and "thinking people were after him." She also testified PTSD could cause a person to hear voices or see things that are not there, but

she did not state that was the case for Santiago. And Santiago's wife testified he seemed more paranoid after his miliary service because he did not like to be around other people and "was always looking around to see who was nearby him," or believed people were "following him."

Assuming, without deciding, the foregoing could amount to some evidence that Santiago experienced hallucinations or delusions,[7] none of it suggests Santiago suffered delusions or hallucinations on the night of the stabbing. (Cf. *Mejia-Lenares*, *supra*, 135 Cal.App.4th at pp. 1444–1445, 1461 [at the time of the stabbing, the defendant hallucinated victim was the devil].) Any evidence that Santiago experienced hallucinations or delusions was thin, at best. Counsel was "not constitutionally ineffective in failing to request [an] inapplicable instruction. (*People v. Suazo* (2023) 95 Cal.App.5th 681, 696; see *People v. Smith* (2021) 70 Cal.App.5th 298, 313, fn. 24 [counsel not ineffective for failing to request instruction unsupported by substantial evidence].)

Second, defense counsel could have made a tactical decision to focus on Santiago's imperfect self-defense theory to challenge his culpability for murder. Imperfect self-defense is not available if it is premised "solely on delusion." (*People v. Elmore* (2014) 59 Cal.4th 121, 145 ["A claim of self-defense based solely on delusion is . . . a claim of legal insanity."]; see *Mejia-Lenares*, *supra*, 135 Cal.App.4th at pp. 1453–1454 ["[a] person acting under a delusion is not negligently interpreting actual facts" as

---

[7] See *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1453, footnote 22 (*Mejia-Lenares*) (defining delusion); *People v. Padilla* (2002) 103 Cal.App.4th 675, 678–679 (defining hallucination).

required for imperfect self-defense].) Counsel may have reasonably feared that introducing the notion of delusions or hallucinations (on sparse evidence) could have undermined the jury's perception of Santiago's relatively stronger imperfect self-defense theory. That is, a reasonable attorney could "have tactically concluded that the risk of [such an] instruction . . . outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394.)

The jury ultimately was not persuaded by Santiago's imperfect self-defense theory, but we cannot say counsel's decision to focus on that theory at trial was professionally unreasonable.

## C.    Santiago Failed to Demonstrate Prejudice

Santiago's ineffective assistance of counsel claim also fails because he has not demonstrated prejudice arising from the failure to request CALCRIM No. 627. That is, even assuming it was "professionally unreasonable" for counsel not to request the instruction, there is no reasonable probability that a request, had it been made, "would have resulted in the giving of such instruction[] by the superior court and in the returning of verdicts in accordance therewith by the jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 735–736 (*Waidla*).)

As we explained above, any evidence that Santiago experienced hallucinations or delusions was minimal. We see no reasonable probability the trial court would have given the requested instruction in light of the dearth of evidence supporting it. (See *Waidla, supra*, 22 Cal.4th at pp. 735–736 [court unlikely to have given an instruction unsupported by substantial evidence]; see also *Marshall, supra*, 15 Cal.4th at p. 39 ["A trial court must give a requested instruction only if it is supported by

substantial evidence . . . ."].) Moreover, if the instruction had been given, we see no reasonable probability the jury would have seized upon that minimal evidence to conclude Santiago was guilty of murder, but only in the second degree. (See *Waidla*, at p. 735 ["there was not substantial evidence that would absolve [the defendant] of burglary and robbery but not trespass and assault"].)

We therefore reject Santiago's claim that he received ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.


RICHARDSON, J.


I CONCUR:


LUI, P. J.

23

**People v. Santiago**
**B335345**

**Chavez, J., Concurring.**

I concur in the judgment only.


CHAVEZ, J.


1